FILED

11/17/2017

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs July 25, 2017 at Knoxville

**BRANDON LEON FORBES v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Madison County**
**No. C-16-249          Roy B. Morgan, Jr., Judge**

_____

**No. W2017-00310-CCA-R3-PC**

_____

The Petitioner, Brandon Leon Forbes, was convicted of aggravated burglary, theft of property valued at $10,000 or more but less than $60,000, and vandalism of property valued at $500 or less and was sentenced as a Range III, persistent offender to a total effective sentence of twenty-four years. Subsequently, his convictions were affirmed on direct appeal. State v. Brandon Leon Forbes, No. W2014-02073-CCA-R3-CD, 2015 WL 5813434, at *1 (Tenn. Crim. App. Oct. 5, 2015). He then filed a timely petition for post-conviction relief, alleging ineffective assistance of trial counsel. The post-conviction court denied relief, and we affirm that order.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and J. ROSS DYER,, JJ., joined.

Joseph T. Howell, Jackson, Tennessee, for the appellant, Brandon Leon Forbes.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; James G. (Jerry) Woodall, District Attorney General; and Jody S. Pickens, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The facts resulting in the Petitioner's convictions were set out in the direct appeal opinion of this court:

Lucy Munoz testified that on February 15, 2013, she and her three-year-old son were living with her parents and younger brother at their home in Jackson. Lucy recalled that she had gone home in the early afternoon for her lunch break that day. When she pulled into the driveway, Lucy noticed that no one appeared to be home but that the garage door "was probably one-fourth open." Lucy opened the garage door and noticed that the garage was empty but that the interior door from the garage to the house was open. Lucy testified that this was very unusual.

Lucy entered the house and walked toward her room. Lucy noticed that "all the lights" were on. Lucy testified that nothing else "looked abnormal" to her until she got to her parents' bedroom and saw that it had been ransacked. Lucy recalled that a large dresser "had been pulled out off the wall into the middle of the room and [its] drawers were all open." The television that had been mounted above the dresser was gone. Lucy then noticed that "all the other drawers of everything they had [were] opened" and so was the door to their bedroom closet.

Lucy testified that at that point, she realized the house had been burgled. She then "froze" in her parents' bedroom and called her father. Her father told her to call the police. Lucy testified that she then left the house and called the police from a neighbor's house. Lucy returned and walked through the house with the police when they arrived. Lucy recalled that her bedroom "was messy." The window in her bedroom facing the backyard had been broken out. Lucy noticed that all of her "drawers were open" and that her television, DVD player, and laptop were gone.

Lucy recalled that her son's room appeared to be "completely untouched" with maybe a drawer open. Lucy testified that her younger brother lived upstairs and that in his room, a television had been taken, along with his computer, paintball equipment, video gaming console, and several video games. Lucy also testified that the gate to their backyard, which they normally kept shut, was open and that the backdoor of the house appeared to have been damaged.

On cross-examination, Lucy testified that the day before the burglary, there was a child support hearing between her and her son's father, Blake Andrews. Lucy denied that Mr. Andrews knew about her parents' safe and other valuables in the house. Lucy testified that Mr. Andrews was Caucasian with brown hair and blue eyes. Lucy also testified

that Mr. Andrews died in a car accident prior to trial. Lucy admitted that she did not know the [Petitioner].

Carol Munoz testified that on February 15, 2013, she received a phone call from her husband asking her to go to their house because it had been broken into. Carol testified that, at the time of the burglary, she and her husband owned a restaurant and she prepared "taxes for the Hispanic community." Carol explained that most of her customers paid in cash for her tax preparation services. Carol further explained that there was a significant amount of cash in her home at the time of the burglary because it was the middle of "tax season."

Carol testified that a "safety box" had been taken from her bedroom closet. Carol estimated that the "safety box" contained between $10,000 and $15,000 cash when it was taken from the house. Carol testified that the "safety box" also contained four rings, "a gold watch," a ruby bracelet, a gold bracelet, and several uncirculated coins. In total, Carol estimated that the items taken from her home, in addition to the cash, valued approximately $9,000. Carol testified that she was most upset about the gold bracelet that had been taken because it had been given to her by her grandmother and was "pure gold."

Thomas C. Wilson testified that he was the victims' neighbor and that on February 15, 2013, he went to their house after he saw that the police were there. Mr. Wilson was told about the burglary, and he told the police that he had seen a white car speeding through the neighborhood earlier that day. Mr. Wilson testified that the car stopped in front of the Munoz home, and he saw an African American man get out and walk to the front door.

Mr. Wilson testified that the man who got out of the car appeared to be less than six feet tall and weighed approximately 150 to 160 pounds. Mr. Wilson admitted that he was too far away to identify the man's face and that he did not see the man again after he walked to the front door. Mr. Wilson testified that the driver of the white car was a "[h]eavy set" African American man.

Mr. Wilson recalled that after dropping off the smaller man, the white car drove away. "A short time after that," the white car "circled through" the neighborhood and left again. Mr. Wilson testified that the white car then "came back and turned into the [Munoz's] driveway." Mr.

Wilson admitted that after the car turned into the driveway he "couldn't see it" and did not see it again that day.

The police were unable to find any fingerprints at the Munoz home. However, on February 25, 2013, Investigator Dewayne McClain of the Jackson Police Department (JPD) and several other officers executed a search warrant at a home owned by the [Petitioner's] mother, Patricia Sain. Inv. McClain testified that there was no one at the house when they arrived. Ms. Sain's daughter arrived soon after the police did and let them in the house. Shortly after that, Ms. Sain arrived at the house.

Inv. McClain recalled seeing Ms. Sain make a phone call during the search of the house. Inv. McClain testified that "at some point," Ms. Sain handed the phone to him and said that he needed to talk to the [Petitioner]. Inv. McClain further testified that he was familiar with the [Petitioner's] voice and that he recognized the voice he heard on the phone as being the [Petitioner's].

According to Inv. McClain, the [Petitioner] said, "[M]y mama ain't got nothing to do with this." Inv. McClain claimed that the [Petitioner] then said that he knew what the police were looking for and that he could tell them where it was himself. Inv. McClain testified that the [Petitioner] told him that "the coins and stuff" were in the attic hidden under some insulation beneath "the air conditioning unit at the top of the stairs." However, Inv. McClain testified that the [Petitioner] never admitted to committing the burglary.

Inv. McClain sent another officer, Investigator Kenneth Jones, to the attic to check under the air conditioning unit. Inv. Jones found a blue bag where the [Petitioner] said the items would be located. Inside the bag were a gold bracelet, several nickels, an uncirculated silver dollar, and several uncirculated one-dollar coins. Carol identified the gold bracelet as the one given to her by her grandmother and testified that the coins had all been in the "safety box." These were the only items the police recovered from the burglary.

Inv. McClain testified that the [Petitioner] used his mother's house as his address. Ms. Sain testified that on February 25, 2013, her daughter lived at the house and that her daughter's boyfriend and the [Petitioner] "sometimes" did also. Ms. Sain claimed that her daughter called someone and that she simply handed the phone to Inv. McClain without speaking to

- 4 -

the person on the other end of the line or asking who it was. Ms. Sain admitted that after speaking with the person on the phone, the police searched the attic and recovered the stolen items, which she "signed for."

Ms. Sain testified that the [Petitioner] had stayed at her house during the first or second week of February 2013. Ms. Sain also testified that on February 25, 2013, she did not know where the [Petitioner] was but that he was supposed to be in Detroit, Michigan. Ms. Sain further testified the [Petitioner] did eventually go to Detroit but that she was not sure exactly when that was. Ms. Sain claimed that she did not know who put the stolen items in her attic.

Ms. Sain was confronted at trial with a recording of a phone call between her and the [Petitioner]. In the phone call, Ms. Sain said that, "the s--t was in [her] house" and told the [Petitioner] that, on the day the search warrant was executed, she gave the phone to Inv. McClain and said it was the [Petitioner] on the phone.

JPD Investigator Kevin Mooney was called by the [Petitioner] to testify at trial. Inv. Mooney testified that he was the responding investigator to the Munoz home on February 15, 2013. Inv. Mooney recalled that the patrol officers who responded to the house had compiled a list of stolen items. Inv. Mooney admitted that the gold bracelet found at Ms. Sain's house was not on the list. Carol testified that she could not remember if she told the responding officers about the bracelet immediately after the burglary. Inv. Mooney testified that it usually takes some time for people to realize what had been taken after a burglary. Inv. Mooney also testified that, to his knowledge, no one ever spoke to Mr. Andrews about the burglary.

The [Petitioner] also called Mario Munoz to testify at trial. Mario testified that on the day of the burglary he told the police that Mr. Andrews "could have possibly" been the perpetrator. Mario explained that he said this because the day before the burglary, Mr. Andrews and his daughter had been in court "for child support or something" and that Mr. Andrews had "seemed upset" about the outcome of the hearing. However, Mario testified that Mr. Andrews had never stayed in his house and was "[n]ot really" familiar with it. Mario admitted that he did not know the [Petitioner].

- 5 -

The [Petitioner] testified in his own defense at trial. The [Petitioner] denied burglarizing the Munoz home or even knowing where it was. The [Petitioner] also denied knowing who committed the burglary or how the stolen items got into his mother's attic. The [Petitioner] claimed that on February 25, 2013, he was in Detroit and denied ever speaking to his sister, his mother, or Inv. McClain that day. The [Petitioner] insisted that his mother was lying about him being on the phone and speaking to Inv. McClain during the search of her house.

The [Petitioner] continued to deny speaking to anyone on the phone on February 25, 2013, even after being confronted with the recorded phone conversation between him and Ms. Sain. The [Petitioner] admitted that in the recorded phone call he argued with his mother because she had told the police it was him on the phone on February 25, 2013. Also during the recorded phone call, Ms. Sain said that her daughter's boyfriend was "the one that told [the police] about the f--king place [the Petitioner] went."

The [Petitioner] admitted that he had listed his mother's house as his address on February 1, 2013. The [Petitioner] also admitted that he was five feet, eleven inches tall and weighed approximately 150 pounds.

Based upon the foregoing evidence, the jury convicted the [Petitioner] of aggravated burglary, theft of property valued at $10,000 or more but less than $60,000, and misdemeanor vandalism for the damage to Lucy's window.

Id. at *1-4 (footnote omitted).

At the evidentiary hearing, the Petitioner testified regarding his complaints against trial counsel. He asserted that he had wanted to present as a witness his sister, Courtney Forbes, who would have testified that the voice on the telephone was not his. Additionally, he had wanted to present an alibi defense to show that he was in Detroit, Michigan, at the time of the crimes. He recited the names of the witnesses he believed would have established this and said he gave those names to trial counsel prior to the trial. The Petitioner testified that he had wanted trial counsel to hire an investigator to obtain information regarding the police officer investigating the case because, as best we can understand, the officer was being investigated for an unrelated matter. Further, an investigator could have "checked on" the Petitioner's alibi. Also, the Petitioner wanted Carly Mendez investigated for 123 counts of "fraud, tax fraud, money laundering and unlicensed business." The Petitioner claimed that trial counsel was additionally deficient for not negotiating a lower plea offer than that offered by the State.

The Petitioner said that he asked trial counsel to file a motion to suppress the search warrant for his mother's house, but trial counsel said that the judge would "deny it anyway." The Petitioner testified that trial counsel did not adequately communicate with him prior to the trial. He said he met with trial counsel only three times, with none of the meetings lasting longer than two minutes. The Petitioner said that he had wanted to know the identity of the informant for the search warrant. Additionally, the Petitioner said that trial counsel should have more effectively cross-examined Investigator McClain. He said that if trial counsel had properly explained the charges to him, he might have accepted the plea bargain offered by the State. According to the Petitioner, trial counsel should have objected when the prosecutor told the jury, during voir dire, that the prosecutor had been the victim of a burglary.

On cross-examination, the Petitioner acknowledged that his sister, Courtney Forbes, would have testified that it was not the Petitioner's voice on the telephone, even though his mother had said that it was. The Petitioner said, to his knowledge, his sister had twice served prison sentences for theft. Additionally, she recently had been released from the county jail. The Petitioner acknowledged that no witnesses were present to testify that he was in Detroit at the time of the crimes. Further, he said that he was not guilty of the offenses, so he would not have entered a guilty plea no matter what the offer. The Petitioner acknowledged that he had "fired" his trial attorney so he could represent himself and, later, asked the court to reappoint the same attorney to represent him. Further, the Petitioner acknowledged that he was not living in his mother's house at the time of the crimes but, instead, was living in Michigan.

Courtney Forbes, the Petitioner's sister, testified that she would have testified at the trial, had she been asked. Her testimony would have been that Paris Transou also was living in her mother's house at the time of the crimes and had "free will to be in [their] residence."

On cross-examination, Ms. Forbes testified that she had twice been incarcerated in the state penitentiary, once for identity theft and a second time for violating her parole. She said she did not know exactly how many times she had been arrested for shoplifting, but it was "not more than ten." Additionally, she acknowledged that she had just been released from the Shelby County Jail for violating her probation for driving on a revoked license. She said she did not "keep up" with the number of her felony convictions but acknowledged it was between one and four. She clarified that only two of her shoplifting arrests had resulted in convictions. She acknowledged that she had one conviction for forgery and one for theft over $500.

The Petitioner was recalled and testified that he asked trial counsel to request a mental evaluation because the Petitioner was "mildly retarded," but trial counsel responded, "You look fine to me." The Petitioner explained that he had been diagnosed as "ADAE or mild [sic] retarded." Based upon this, the Petitioner hypothesized that a mental evaluation might have shown that he was not competent to stand trial. The Petitioner acknowledged that he had completed some of the available programs while incarcerated and made it to the twelfth grade in a resource class, but he had neither a high school diploma nor a GED. He said he had been through the court system ten or more times but always had pled guilty. He understood the roles of the judge, defense attorney, and prosecutor. Previously, judges had explained his rights, and he understood them. He had asked to represent himself because he believed he could do a better job than trial counsel, and he was not going to let anyone "railroad" him.

Trial counsel testified that on the morning of the trial, the Petitioner said that he wanted his sister, Ms. Forbes, to testify. However, Ms. Forbes told trial counsel she did not want to do so, and her testimony "wasn't necessarily going to be beneficial" for the Petitioner. As for the Petitioner's claims regarding an alibi defense, trial counsel said the Petitioner told him he was incarcerated in Wayne County, Michigan, at the time of the crimes, but, following several telephone calls to the jail, counsel was unable to verify this. As to alibi witnesses, trial counsel believed that either the Petitioner did not provide him with the names of witnesses, or, if he did, he had no contact information. Trial counsel did not recall the Petitioner's asking for an investigator to be retained. Even if that had been done, the investigator would not have learned of the information the Petitioner believed could have been used for impeachment of Investigator McClain or Ms. Munoz.

Trial counsel said that, as a matter of routine practice, he would have asked the State for a plea offer, but counsel did not believe the Petitioner was willing to enter a plea unless he was to receive probation, which counsel did not consider to be a "likely outcome dealing with [the] case and [the Petitioner's] past." As for a motion to suppress the search of the home of the Petitioner's mother, trial counsel did not believe the Petitioner had standing to challenge it, given his claim that he did not reside there. Trial counsel said that he met with the Petitioner "numerous times" prior to the trial, with the meetings lasting "on average at least 20 minutes." Trial counsel did not recall the Petitioner's asking him about a mental evaluation, and counsel did not "see anything during the course of the case to throw up any red flags as far as competency issues or anything that would support an insanity defense."

On cross-examination, trial counsel said that he had looked into the Petitioner's alibi claim, but he was unable to find proof to substantiate it. In view of the Petitioner's multiple felony convictions, trial counsel did not believe it would be helpful to have the

Petitioner as the only witness to testify as to his alibi. Trial counsel testified that, even if he had retained an investigator, he would not have learned of the FBI/IRS investigation of Ms. Munoz. Trial counsel did not believe the Petitioner had standing to object to the search of his mother's house nor needed to undergo a mental evaluation as to his fitness to stand trial. Trial counsel said that, in a proceeding a month earlier, there was no suggestion that the Petitioner be examined as to his competency. Trial counsel had no problem communicating with the Petitioner, who sometimes drafted his own pleadings and presented counsel with case law.

At the conclusion of the hearing, the post-conviction court made oral findings, which were incorporated later into a written order, denying the petition. The court noted that, during the trial in this matter, the Petitioner had "basically said . . . to the jurors" that his mother was lying. However, the jury found his mother to be the more credible witness. The court determined that the Petitioner had failed to show that he had standing to object to the search of his mother's house. As for the claimed alibi defense, the court noted that the Petitioner presented no witnesses to show that he was in Detroit at the time of the crimes, and trial counsel testified that he was unable to confirm the alibi. We agree with the post-conviction court that the Defendant's sister would not have been a helpful trial witness, especially considering her lackadaisical attitude at the evidentiary hearing and inability to remember how many theft and shoplifting convictions she had. According to the transcript of the evidentiary hearing, her convictions were numerous. Regarding hiring an investigator, the court determined that the Petitioner had failed to prove that a police officer and Ms. Munoz were having an affair or that an investigator could have discovered this to be the case. As for communicating with his client, the court noted that trial counsel testified as to his several meetings with the Petitioner, who failed to prove the trial outcome would have been different had there been additional meetings. As to the Petitioner's claim that trial counsel should have sought a mental evaluation for the Petitioner, the post-conviction court noted that the Petitioner was articulate at the evidentiary hearing and "had no problem understanding and communicating in court today." Accordingly, the court found the Petitioner had failed to establish that trial counsel should have sought a mental evaluation.

## ANALYSIS

We will review the analysis of the post-conviction court that the Petitioner failed to prove that trial counsel provided ineffective assistance or that the Petitioner was prejudiced thereby.

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are

conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is de novo, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In the context of a guilty plea, the petitioner must show a reasonable probability that were it not for the deficiencies in counsel's representation, he or she would not have pled guilty but would instead have insisted on proceeding to trial. Hill v. Lockhart, 474 U.S. 52, 59 (1985); House v. State, 44 S.W.3d 508, 516 (Tenn. 2001).

- 10 -

Courts need not approach the <u>Strickland</u> test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; <u>see also</u> <u>Goad</u>, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

We have set out the findings of the post-conviction court, and these are certainly supported by the appellate record. Accordingly, we agree with the determination of the post-conviction court that the Petitioner failed to show either that trial counsel was ineffective or that he was prejudiced thereby.

## **CONCLUSION**

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
ALAN E. GLENN, JUDGE